Good morning, Your Honors. My name is Garbaset Mekcan, and I am representing the Shahinyan family, in this case, Anna Shahinyan and her two children. May it please the Court, in this case, we are respectfully submitting that the petitioners in this case have done everything necessary that was asked for them on the statute as well as on the case law to entitle them to the relief of asylum. In this particular case, these people, like all Armenians, transients, came from one place, they landed up in another place, and then finally they came here. They're from Azerbaijan, except for the younger, Susan Hyrapedian, who was born in Askaran, which is now part of Legaro-Karabakh, which has been part of Armenia as a result of the fights and war between Azerbaijan and Armenia. We had part of the transcript was missing from the record, and so it wasn't clear what was the issue relating to the fraudulent birth certificates. Can you explain that and what the IJ ruled on that? Yes. What happened in this case, if I may give you just one moment of historical background, these people left the country without any type of documents. They came through Mexico, they ended up in Sacramento, where they met someone who was a husband's friend who helped them with the asylum application. Subsequently, no documents, no passport, no birth certificate, nothing. They were recommended to go to an agency that had a reputation in Glendale of being able to get documents from governmental sources. They promised them that for a fee, they had the sources to get birth certificates from the country of Azerbaijan. They went to San Francisco, the asylum office, that's where they lived. They were given a subsequently recommended approval. They're waiting, they're waiting, they're waiting. Eventually, after some time, they received a letter that we want the originals of the birth certificates, and they were sent for examination, forensic examination. It came back, I don't agree with that word, fraudulent, and then they were referred to the court. They ended up in Los Angeles because they had subsequently moved to the Los Angeles area, and the immigration judge had an opportunity to review the record or review the testimony and found them credible. But he said, you have to give me some documentation, prove who you are. So the IJ credited their representation that they were not aware that the birth certificates were fraudulent. Yes, the IJ took great pains to recognize that they were not at fault for anything with regards to the retrieval of these documents. Now, did the IJ make an adverse credibility determination? He did not. That's the issue. He did not make a credibility determination, and it is our position that not only did he not do that, but he was predetermined from the onset to say, I'm not going to make a decision in this case. Let it go up on appeal. Let them deal with it. And so you're relying on the Kalauma case, I suppose. Yes. In other words, your position, if I understand it correctly, is that the identity can be established by the statement of the petitioner himself, and as long as there's no adverse credibility determination, there's no problem. One step even further, at page 100 of the administrative record, there's a discussion between the judge and the government attorney, where the judge is asking the government attorney, what do you think about this? And the government attorney is saying to the judge, well, Judge, at page, I'm sorry, lines 15 and 16, she can go, she can establish where she's from, I mean, I guess it's up to the court. In other words, the government is agreeing that the court, who has had the best opportunity to observe, to listen, and to rely on the whole record, make a determination where these people are from. And it is our position that the judge has, in effect, given up his responsibility by saying, you know what, I don't want to deal with this. So the BIA has a long history of interpreting the regulation 208.13 as saying that an IJ can request corroborating information without making an adverse credibility determination. I know our case law has been different, but now we have this brand X decision from the Supreme Court that says the agency gets to interpret its own, the statute and the regulations, and we defer to that. So what do we do about the fact that the BIA continues to interpret its regulation as saying IJ can ask for corroborating information even without making an adverse credibility determination? But the question then becomes this. I agree that they make their own regulations. The issue then becomes, in this case over here, is why is the IJ asking for corroborating evidence? And is there enough and sufficient evidence? Are the people credible? Has the IJ observed these people, especially when he finds them credible? Is it still necessary to ask for corroborating evidence? Well, we have, even our case law says if the IJ doesn't believe the witness or doesn't know what to believe, which is what the IJ said here, then it's permissible to ask for corroborating evidence. Well, with all due respect, Your Honor, the IJ did believe, at least on substantive issues. The issue was that, with all due respect to the judge, in a mocking way, he totally makes fun of these people. Even though he recognizes the sufficient precedent of Armenians in Azerbaijan, the lady is detailing sufficiently her plight, her family's plight. And the judge, in this case here, still makes these people, not that he doesn't find them credible, but he says, you know, you need more. You need more. Even though it is our position that it was not necessary. So he says, you gave me the birth certificate information. Identity information is fraudulent. I don't blame you. You didn't know. You've made a statement as to what your identity is, but I don't know what to believe. I want to see some corroboration. Now, why wasn't the IJ entitled to do that? He was. There's also one issue over here, Your Honor, in regards to the conclusion that came from the forensic laboratory. It is our position that in this case here, this was done not professionally. The examiner had just begun dealing with Soviet Union. Very important that it was Soviet Union. By the time these cases had come, there was no longer Soviet Union. Fifteen republics, all independent. He had just begun handling these type of cases. He made this examination within two and a half months after he began his dealing with Russian, excuse me, Soviet Union documents. Nobody from the government, nobody from the court asked for the supervisor, Mr. Ruth, to come forward. His work was evaluated. There's a question here as regards to in that fight, in that war between Azerbaijan and Armenia, whether or not they are in fact still using former Soviet Union documents. Have they made changes? Have there been any consistency or not? These issues have not been addressed. So the problem we have is from the outset, we do not agree with the conclusion that these documents are not fraudulent. They've used the basis to compare to former Soviet Union from the 50s and 40s or whatever, when in fact we should bring this forward to the 1990s when this issue is no longer valid. There is no longer Soviet Union. So the judge should also take into consideration when he does, says, I accept that there's been a conflict between Armenia and Azerbaijan, he should also recognize that when this examiner who really doesn't have the sufficient experience and time to make this conclusion, he should also take judicial notice that perhaps there have been some changes made. What are you asking us to do? I'm asking Your Honor to say that these people are entitled to asylum. They met their burden and they are entitled to asylum. You don't think there should just simply be a remand for the agency to make a credibility determination one way or another? Maybe it's my arrogance, Judge. I respectfully think that this case is maybe an extension and maybe it's a little tangent from Kalouma and it requires to address the issue, whereas in Kalouma the people had no documents. In this case here, these people brought documents which they sincerely believed to be honest, to be genuine. Nobody has even said they had any fault in this. So therefore, it is our position that this court should grant them asylum. The alternative, if the court believes that they should go to a lower court for remand, then that would be an alternative. Thank you, Counsel. Your time has expired, Counsel. We'll hear from the government. May it please the Court. Again, Arthur Raven for the government. The issue of identity arose and was pointed out during the initial hearing when the immigration judge was just talking about when to schedule the merits hearing. He specifically told the aliens and their counsel that because there was evidence that they had submitted fraudulent documents of identity, their identity was at issue because he said... But he made no adverse credibility determination. No, Your Honor, because as part of their burden of proof to show that they are refugees, it is an element of asylum to prove you are who you say you are. But doesn't Kalouma overrule that argument? If I were on the Kalouma Palace panel, my colleague was on it, I might have been closer to the Talman view. But it is the law of the circuit, and under the law of the circuit, so long as the petitioner professes that he is who he is, absent an adverse credibility determination, he has to prevail, does he not? We would submit that Kalouma is distinguishable because in that case there was no evidence of fraudulent documentation to put identity into question. I mean, we're saying here's an immigration judge that is confronted with people who are claiming to be refugees, and as part of that they submit fraudulent documents, birth certificates, to show where they're from and part of their claim. And now they say, oh, we did not know it was fraudulent, so please believe us. Now, it is agreed that he did not make an explicit adverse credibility finding, but under the regulations, that is part of their burden. And as Judge Ikuda pointed out, under Brand X, the court, we would submit, should give the board its interpretation deference of its own regulation. Because here, identity... Which regulation and which cases are we talking about when we talk about Brand X? It wasn't briefed, that wasn't briefed in the... No, Your Honor. There's no briefing on that? No, Your Honor. Nothing in the board's decision? I'm just addressing Judge Ikuda's comment. I'm just saying here that, you know, the regulation obviously is 28.13, which talks about the burden. But without even addressing that issue, you know, we noticed that the two cases are distinguishable. Whereas in Kaluma, there was nothing to put identity into issue, and the judge could have just simply went with the testimony. Here, we have fraudulent documents. And reasonably, the judge... But didn't, as Judge Scanlon pointed out earlier, didn't I.J. essentially say that he believed that they, that the petitioners did not know, he believed their story when they said they didn't know that they were fraudulent? Well... He credited that? Yes, he basically said, yeah, okay, I believe that maybe you did not know. That does not mean that as an issue of fact, they had put in fraudulent documents. Nonetheless, he, as part of their burden, says, then, who are you? Show me who you are. And he gave them four months. Let me ask you this. You know, prior to the Real ID Act, I thought our case law said that you couldn't require cooperation unless you first found that the petitioner was not credible. That is correct, Your Honor. So here, I mean, had the I.J. found that they were not credible, he clearly, I mean, under our case law, he clearly could have required corroborating evidence. That's correct, Your Honor. It seems to me the problem here is simply, is that the I.J., again, as Judge Scanlon alluded to, just sort of threw up his hands, said, I don't know what to do. You know? I mean, granted, Your Honor, there was no explicit adverse credibility finding. But we will submit that this is a special case that shows that here an immigration judge is put into a position where he cannot even tell if these people are refugees. He doesn't know who they are. They put in false documentation. Well, I mean, you could say, I've listened to your testimony. There's these documents. I just, I don't find you credible. Or I find you credible. And you've established that you're from, you know, wherever it is, Azerbaijan or wherever, Armenia. Why doesn't this case just go back to the agency for them to complete the analysis, for the I.J. to do what he should have done, just make a credibility determination one way or another? Because the Board, you know, decided this case based on the fact that it's part of their burden. And the decision, you know, does not go into whether or not he went into, you know, adverse credibility, whether it was explicit. So basically the decision hinged on whether there was any objective evidence to show they were who they were. It's part of their burden. And, you know, under the regulation, that is part of their burden. And, you know, this was all credibility aside. We're talking burden alone where the aliens put in false, well, counterfeit documentation. And at this point the Board, or the immigration and the Board, are put into a position of how do we give asylum to someone we don't know who they are or where they're from. And we give them time to produce such documentation. And there's evidence that the woman's husband was still in Russia. Her grown kids were living in Russia. She had the opportunity to get some kind of documentation, whether from Azerbaijan or even Russia, where she had lived for a period of time after escaping from Azerbaijan. So we would just say that this is an exception to the Klumer Rule where an alien initially presents counterfeit documents, putting her identity into issue. Thank you, Counsel. Anything further? No, Your Honor. Very well. Mr. Both sides have used up their time. The case just argued will be submitted for decision.
judges: O'scannlain, Paez, Ikuta